Well, in this case, on the document 2-15-0112, the people of the city of Des Moines, the San Francisco Police, and Officer DiBenedetto defended the felon. Arguably, on behalf of the defendant, the felon, the accused, Mr. McCoy, arguably, on behalf of the deceased felon, Mr. Michael Cedillo. Mr. McCoy. May it please the Court, Counsel. My name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Mr. Salvatore DiBenedetto. In this case, there were two issues presented. First, whether the prosecutor committed misconduct in his closing argument, and second, whether Count 6, the wire fraud count, should be vacated based on the One Act, One Crime doctrine. On the first issue, there were multiple categories of improper comments in the State's closing. The most serious one, and the one I would like to begin today by focusing on, was the prosecutor stating his personal opinion about the witness's credibility. Well, are you saying that's because he used the words, I think, as opposed to relying on the evidence and relying on the observations of the witness when the witness testified to? Because if you're saying that because he used the words, I think, that's very different than, for example, in the Roach case, where the prosecutor talked about his own personal feelings. Well, we're acknowledging in this case, too, the Roach case, and saying that here, too, the prosecutor did talk about his personal feelings. How did he talk about his personal feelings? He didn't use the same languages in the Roach case. Not verbatim the same language. What he specifically told the jury here was, quote, Ms. Fox is a kind, decent, honest person, and the one thing I think took away, it seems like he missed a word there, and I think becomes clearly obvious, is that this woman is a fundamentally decent and honest person. And so it's the combination of using the first person, I think, as well as sort of these intuitive judgments about her being decent, honest, kind, that really is what makes this argument improper and what separates it from him merely commenting on the evidence or drawing inferences from the evidence. Is a kind, decent person more credible or less credible than an unkind, undecent person? More credible, especially in this case. How do you know? Well, it's essentially the argument is. Did you just say I think? The point I'm getting at is, they're not supposed to discuss the witnesses in such a way as to attempt to bolster either the factual aspects of their testimony or their credibility. And discussing someone as a kind person doesn't necessarily mean that they are more credible. I've met very kind people who didn't know what they were talking about or didn't know what they observed. In the context of this case and the facts of this case, using this language was bolstering the witness's credibility because it really came down to, the state's case came down to her credibility. And if she is a, basically the state is saying she's a good person. You can trust her. She's a good person. This isn't someone who would come in to lie to you. This is someone you can trust. And that is the state bolstering the credibility of the witness and essentially stating its own personal opinion on the witness's credibility, which is solely the role of the jury in this case. But now there were other witnesses in this case, and there was other evidence as well. So while she may have been an important witness, she certainly wasn't the only witness. Not the only witness. And this was, the evidence wasn't really closely balanced here either. Well, our argument is it was closely balanced, and it is because her testimony is the key to the entire case. It's the linchpin tying all the other evidence together. Obviously other evidence was introduced in this case, but it didn't prove much without Fox's testimony and her being credible is really what tied everything together in this case. All this other evidence could have been introduced, and there would have been no proof of a fraud unless Fox testifies because she's the only one present when the defendant asks for these payments, when the defendant tells her what these payments are going to be for. There's no hard evidence corroborating her testimony. There's nothing from our view. How is her hard evidence corroborating her testimony when we have people testifying that these contracts were false, they were forgeries, we have bank records showing all the transactions that Fox testified to? I mean, how is that not corroborated? It doesn't corroborate the reason that she paid him the evidence. In fact, the contracts themselves contradict her testimony regarding why she was willing to pay the defendant over a million dollars because the vast majority of this money she pays him is based on these contracts. Yet they were filled with red flags such that it's a very close question whether anyone would believe her suspect's story that she thought these contracts were real, let alone that they served as a basis to give the defendant over a million dollars. And going to the contracts themselves, the first red flag is the price of the townhomes themselves. I'm trying to understand the point. Is it that she is so stupid that the criminal intent in your client has been disproven? It would seem that they're mutually exclusive. You can have very smart victims and the person has still committed the same crime. So what does her credulity or her ability to decipher whether or not these were written on onion paper and signed with crayons, how does that have anything to do with what Justice Burke was talking about, which is corroboration, which is if I present forged documents, by definition I believe a forged document is any document that was produced or made or delivered in such a way as to defraud someone. So why is it relevant material that you've defrauded a stupid person as opposed to defrauding a smart one? Well, that's not exactly the argument we're proposing. The argument we're proposing is no reasonable person, especially a successful businesswoman such as Fox, would have believed these contracts to be true. Therefore, there's a reasonable doubt that Fox herself did not believe that these contracts were legitimate. And if that's the case, then there is a reasonable doubt whether or not she paid this money for the purpose to which she testified to, which in turn creates a reasonable doubt whether or not she in fact was defrauded, whether there was deception. So what other evidence was there in the record that she paid this money for a different purpose? Well, it's the State's burden of proof. The defendant does not have to prove his own innocence. Well, but what inferences are you making following up on Justice McLaren's questions? I'm not sure I'm following your argument here. Well, the other evidence in the record is what's kind of operating in the background here, is that Fox needed to show Midwest Bank, where RDP had these loans coming from, millions of dollars of loans, that this was going to be a successful project. So she had a motivation to present, to herself present, false contracts to the bank. So there is certainly a reasonable interpretation of this evidence that she was herself in on some type of scam, and that if that was the case... Who is your client? Again, we don't know. We don't know. Well, there's nothing whatsoever in this record that would even allow an inference of that. That's where it goes back to the fact that she could not have believed the thing she testified that she believed. There is no written agreement in this case. Did anyone argue that in this case? No one argued that. The defense argument in closing was that essentially you could not believe Fox's testimony, that the things I've been talking about here, the lack of a written agreement between RDP and the defendants, the problems with the contracts themselves, the fact is these are all things which would create a reasonable doubt about her story in this case. I thought I heard you say, and maybe you can tell me if you did or didn't say it, or it was in a context that I misunderstood, and that was that this woman had her own scam or could have had her own scam? That's a possibility from the evidence, that she was presenting these contracts to the bank knowing them to be false. And, again, it's given her... And how would she benefit from this? From buying time before the bank closed on her loans, to buy time to make this project successful. And, again, the testimony was undisputed that the bank was looking to call in these loans, that there was nothing happening in terms of this 922 project. If that was her motive, then doesn't that seem to be consistent with and corroborate the abstract perception that she was giving him money to try and stave off the wolf from the door? But how was she doing that? Was she doing that by thinking he actually had these contracts, by thinking that these contracts, which had multiple problems with them, were legitimate? Or was she trying to do it by some underhanded means? And I think a particularly interesting thing is that she says she's giving him almost a million dollars for an escrow agreement, but there's no written documentation to support this escrow agreement. She's never talked to Arcola Bank. No one from Arcola Bank has talked to her. And, in fact, she knows the money was not going to Arcola Bank. She knew it was going to a Harris Bank account. She specifically wired money to this Harris Bank account. Counsel, maybe we ought to turn to your... Before we run out of time, turn to your second argument. Sure. On the one-act-one-crime issue, there's really two sub-issues. First, whether the state at trial included count six as part of count one, and second, whether the defendant invited this error. And the first sub-issue is really rather straightforward. To sustain multiple convictions, the state at trial must apportion the different acts between the different counts. Here the state didn't do that. Well, the indictment does reflect that they did, does it not? Each is reflected in a separate count in the indictment. Count one of indictments, which is the only theft count he's convicted that doesn't get merged, it says the word checks. However, the jury never got that indictment. They got the jury's... They got the instructions. Yes, and the definition... And there were separate instructions with respect to the offense in count one and separate instructions with regard to the offense of wire fraud, which was in count six. Isn't that correct, counsel? That's correct. They got separate instructions for every count. But that's true in any case where we're dealing with a one-act, one-crime issue. There wouldn't be convictions themselves if they weren't separately instructed. But they were multiple acts. There were multiple acts, but the state didn't apportion them. In closing argument, the state specifically told the jury that they could consider the wire fraud count to be when they were calculating the total for count one, the total amount of the theft. And the jury instructions didn't use the words checks. They used the word property in count one. And the jury was also instructed on the definition of property, which included both checks and money. Now, the defendant agreed at the time of sentencing that count six would not merge with the other counts, and that was part of the agreement that he had with the state. Isn't that correct? No. At the sentencing hearing, neither the defendant nor his attorney said anything about the wire fraud count. Well, the court asked about the wire fraud count specifically. The court asked the prosecution about it. And the defense attorney was there and indicated they had an agreement. Isn't that correct? The defense attorney did not say anything in regard to the court's questioning about the wire fraud act. So he stood mute there when his client agreed to what was stated on the record with respect to the separate sentences for both counts, the 12 years on count one and the five years concurrent on count six for the wire fraud. And he agreed that that was what they had agreed to until the judge. He entered into that agreement voluntarily. Isn't that what happened? Isn't that what the record reflects? What the record reflects is that defense counsel said that there was an agreement to a 12-year prison term. Then the state says that there was 12 years on count one, five years on count six. The state and the court then go into a long discussion about the federal, what the defendant's federal guilty plea agreement was. In turn, the defense really says nothing about the number of convictions. They never expressly waive raising this issue on appeal. And the heart of the agreement is the 12-year prison sentence. That's what defense counsel said. What do you mean the heart of the agreement? The court didn't just talk about the 12 years, did it? The court, when admonishing the defendant, said you're giving up the right to argue for less than a 12-year sentence. He did not tell the defendant that he was giving up the right to raise this issue on appeal. And the 12-year sentence is going to stand regardless of how this court decides this issue, which is really what makes this case on all fours with people being morbid, where the same situation in that case was actually a fully negotiated guilty plea. And the court in Morgan allowed a vacated conviction based on the one-act-one crime doctrine. Any other questions? No questions. Didn't the trial court ask the defendant specifically whether he agreed with everything the prosecutor had stated? And this is when the prosecutor talked about the 12 years, talked about the five years, talked about what counts merged, and then the court looked at the defendant and said, do you agree with everything that the prosecutor has said? And the defendant said, yes, I do. He did, but that was directly following this sort of extended conversation about the federal guilty plea, and that seems to be a reasonable interpretation for what the defendant was taking. There's nothing in the record to indicate that the party specifically negotiated for the number of convictions. The federal guilty plea and making the time the same as the federal case is really what the parties were going after in this case, and that's going to happen, again, regardless of whether count six is vacated. Well, counsel, the record reflects that the court said, or defense attorney said, judge, we have an agreement on the sentence. And the court said, okay, all right, this was after a jury trial, and jury returned a verdict of guilty of the counts. What's the agreement? Mr. Lyon says 12 years, Illinois Department of Corrections credit for 149 days. The court says, is that on count one, or what have you done in terms of the wire fraud? It's then that the state answers, judge, I believe the thefty would be sentenced on, the theft count and the wire fraud count. And they go on, and so the one theft count would be the count one of the indictment, and then the wire fraud is count six. So it would be 12 years on the theft count. It would be max five years on the wire fraud pre-run concurrent to the 12th, the court. Right. Okay. So then count two through five merged with count one, and the state says, yes, judge. And then they go on with the colloquy. So that's a little different than you have represented. I apologize if that was the case. I'm not obviously disputing what's in the record. Our argument is the only words from defense counsel is the 12 years. The 12 years. Everything else comes from the prosecution. And then the court says a little later to the defendant, all right, you understand. Well, first, as Justice Burke asked, the court said, do you agree, asking Mr. DiBenedetto, with everything that was just stated? He says, yes. The court says, all right. You understand that if you didn't want to accept the state's offer with respect to these two counts you were sentenced on, you have a right to have a sentencing hearing. Then she goes on. Yes, and the specific question that the judge asked at that point is, do you understand you're giving up your right to argue for less than a 12-year sentence? And again, this is where this case comes back to Morgan because there's no express waiver. And Morgan, what the court held was that it could not be assumed the defendant voluntarily and knowingly pled guilty to improper excess convictions without something in the record suggesting that he voluntarily relinquished a known right by agreeing to the improper expressed convictions. And here again, there's nothing to show that the defendant in this case voluntarily relinquished a known right by agreeing to improper expressed convictions. But the court also relied on the fact that arguably these negotiations violated contract principles of good faith and fair dealing, that the prosecutor was impermissibly tacking on convictions that the prosecutor knew was false. Now, this case, correct me if I'm wrong, is a bit different in that it isn't as clear cut in this case. Now, you argued that the prosecutor argued at closing argument that these things should be together, but as Justice Zinoff indicated, the indictment itself separates out all these crimes, correct? If the prosecutor argued that these crimes are separate and you can find them guilty of cotton wrong if you look together all the checks, forget about the way of fraud, you would agree that he could be subject under this indictment to sentencing in one and six? Correct. Okay. So the indictment itself, at least the prosecutor in good faith can rely on the indictment itself to indicate that one and six could be sentenced. But that's the one act, one crime doctrine isn't just limited to the indictment. It extends to the state's theory of the case and how the state presented this case to the jury through jury instructions and through its closing argument. But I'm also looking at whether the state violated what the court talked about in Morgan as principles of good faith and fair dealing. Did the state violate those principles in this case as it did in Morgan? There's nothing in Morgan that would show any more of a violation of good faith and fair dealing than the facts show here. The good faith and fair dealing here is what were really the parties trying to do. There's, again, no indication. There was specific quid pro quo for the agreement and for the number of convictions. Instead, again, what the parties are trying to do is match this up with his federal time, and that's really the heart of the agreement that the states are attempting to do. Looking at your brief, you do not ask that it be remanded for a new sentencing period. You ask only that the count six be vacated. Correct. So if we don't vacate count six, then you're not entitled to any relief relative to a remand for a resentencing. Correct. Okay. Thank you. You'll have an opportunity to make your vote. Is it Mr. Cibula? Correct. Thank you. May it please the Court, Counsel, I'm Assistant Attorney General Michael Cibula on behalf of the people of the state of Illinois. I think the questioning got related to the weaknesses in the defense case, so I'll try to be brief and focus on first credibility comments because that's what counsel focused on as well. The law is clear that prosecutors are able to flatly state that a witness is telling the truth, and the law is also clear that prosecutors are able to offer an opinion if the witness's demeanor indicates that they're an honest person who told the truth. In the Supreme Court case, People v. Emerson, the prosecutor told the jury, we know that Robert Ray was telling you the truth. We could tell. You tell by the way the man told you what happened that he was telling the truth. The Supreme Court said that those were permissible comments because the prosecutor was trying to invoke the witness's demeanor. How is this case different from what was found to be error in bowling where the prosecutor said, I do think that the victim's statements were credible. It was found to be improper. And here we have the prosecutor saying, I think this woman is decent and credible. In bowling, I think the court relied upon the fact that there was nothing invoked about the evidence for the witness's demeanor. That's different than this case where the prosecutor was careful twice to invoke the way she testified. He was careful to say that the witness stood up there on the stand and she told the truth. And then he doubled back and said, in fact, she was up there on the stand for a long time. And he said the one thing that the jury could take away from that and the one thing that becomes clear from that is that she was honest. She was telling the truth. So he was not offering some intuitive belief. He was not implying to the jury that he knew something they didn't know. When we're concerned with prosecutors bolstering a witness's testimony, that's what we're concerned with, that they're implying to the jury that they know something that the jury doesn't know. Well, if she was lying, would it make any difference insofar as the jury's verdict? I think any comments about her credibility to the extent they were improper or they were incorrect are really irrelevant. I think they were not prejudicial in this case in any way. Contrary to what defense counsel has argued, this was not at all a close case, and it did not rely in any sense exclusively on Mrs. Fox. RDP was the company that was defrauded here. All three partners from that company, Mrs. Fox, Mr. Pankowitz, and Mr. Lumen, all provided completely unrobutted testimony that the defendant proposed that he market and sell their company's townhouses. All three provided completely unrobutted testimony that they accepted that proposal. Are you saying that all three were consistent with each other? All three were consistent. Two of them, Mrs. Fox and Mr. Pankowitz, testified that Mrs. Fox then began paying the defendant. Unrobutted and undisputed, bank records show he was eventually paid $1.2 million, and he never spent a single penny of that to sell townhouses. Instead, the records show he spent that entirely on himself. In his briefs before this court, he admits that he provided the victims with forged purchase agreements, forged loan agreements. So this was not a close case, and it did not rely exclusively on Mrs. Fox. But counsel argues in his briefs that the very number of comments really amounted to substantial prejudice. Why isn't that true? Why shouldn't? Go ahead. I'm sorry. Well, first of all, as we discussed in our brief, you have to look at each comment individually. None of them we think were improper, let alone plain and obvious error. Well, what about the cumulative effect? If none of them were improper individually, then certainly cumulatively they cannot have an effect. And from a prejudicial standpoint, as I said, this case was not close at all. And even if we assume that it relied on Mrs. Fox's testimony, it still was not a close case, as the defendants tried to argue. She provided clear, consistent testimony that the defendant was paid this money to market and sell the townhouses. He has never, until this morning, offered any kind of explanation of why he would have been paid this money if it was not to market and sell townhouses. Now, for the first time this morning, he suggested, well, maybe Mrs. Fox was engaging in bank fraud, if she wanted these fake loan agreements to present to the bank to hold them off. That argument respectfully makes no sense. First of all, the record shows that although Mrs. Fox and the company did have a loan that was used to finance this real estate project, she was paying the interest on that loan every month. If she wanted to commit bank fraud, she certainly didn't need to pay the defendant $1.2 million to forge bank agreements. If for some reason she wanted to provide the bank with forged loan agreements, she could have done that easily herself without giving the defendant $1 million. So we believe none of the comments individually or cumulatively were improper, and they certainly were not prejudicial in any way, given the overwhelming evidence. Counsel, in his brief, cites Wheeler for the standard for reversible error in an argument. That was a preserved error case. Then later in the brief, he acknowledges this is a plain error case and cites Paikowski. What's the difference between Wheeler and Paikowski in this setting? Defense counsel is correct that he did not preserve this argument, so it may only be reviewed under plain error, which first of all would require him to show that one or more of the errors were plain and obvious error. He can't do that. And second, he would have to show that the evidence was so closely balanced that the errors alone took the scales of justice against him and caused him to be convicted. Certainly, again, as I said, the evidence here is so overwhelming that he could not do that. And the alleged errors themselves are so minor, isolated, we don't think any of them are wrong, but they're so small themselves that even if this was a relatively close case, which it's not, they wouldn't have been so significant to tip the scales against him. If there are any questions, I'd like to very quickly move on to the merger argument, if I may, Your Honor. Again, I think the question here this morning got to the weaknesses in this claim. Based on the record, I believe, respectfully, it's unreasonable to argue that this defendant did not freely enter into the sentencing agreement, which provided that the wire fraud would not be merged into the theft. I think as the questioning got to, the record clearly shows this was something that was freely entered into. The defendant told the court he understood the terms of the agreement. Assume for a minute it's not invited error. We've talked about the indictment separating out the counts, but then we, I mean, you have to acknowledge that the prosecutor at least at one point in time in the argument lumped it all together. Yeah, we absolutely agree, Your Honor, that at one point, the prosecutor inadvertently, when he was discussing the total amount of money stolen, he did inadvertently refer to this $100,000 wire transfer. To begin with, that argument's a red herring because, as we've mentioned, what governed the claim, the convictions that merged did not merge. That was purely handled by the sentencing agreement. That had nothing to do with the jury's verdict. The jury convicted him of all six charges against him. Further, Your Honor, to the merits of that argument, I think it's a... Well, I think it has to do with the jury verdict in that the jury could use the wire fraud to get to the million dollars in count one. Correct, Your Honor. So it does have to do theoretically with the verdict. Theoretically, it might, but it didn't in this case for, I think, reasons that are made clear in the defendant's reply brief. As the defendant admits in his reply brief, except for that one inadvertent comment, every other time that the prosecutor discussed the theft charges, he only mentioned checks. As the defendant admits, when the prosecutor was discussing the basic elements of theft of over a million dollars, he only mentioned checks. When he was discussing the smaller theft charges, he only mentioned checks. That's important because it's the smaller theft charges that add up to the theft of over a million dollars. He doesn't challenge the jury instructions anywhere in his brief. He admits that the total amount of checks were well over a million dollars. That's important because it shows that there was no reason for anyone to include this small wire transfer in the theft of over a million dollars, and there's no reason for us to assume the jury did as well. So I think it's a red herring argument, and I think the record is clear that there was in no way that the jury was misled. If I could briefly mention People v. Morgan, which is the case, the one case he cites on merger, the key to that case, Your Honor, is that the defendant there was convicted of multiple counts of home invasion, or excuse me, entered into an agreement in which he pleaded guilty to multiple counts of home invasion. On appeal, he argued that under controlling Supreme Court authority, you can only be convicted of one count of home invasion. You're required by law to merge them. The State agreed with that. So Morgan is in no way like this case. Well, what if we looked at this as one overall scheme, however, to defraud? Certainly, Your Honor. I think that argument is sort of off the table. The law is clear. The Supreme Court is clear that even though there might be one overarching scheme or activities, you can still slice it up into multiple acts and multiple convictions. That's an argument we made at length on pages, I believe, 25 through 27 of our brief, and the defendant does not dispute that analysis in any way. His only merits argument on merger is this idea that the inadvertent statement by the prosecutor misled the jury. So he has conceded and waived any other kind of merits-based argument, as he should have, because the law is clear that even if there's a commonality in the overall scheme, it can be sliced up as long as it's pled appropriately, as we all agreed happened here in the indictment. Thank you. Unless there are any questions, we would ask the court to affirm the conviction and sentence. Thank you. Mr. McCoy. Thank you. Counsel began by saying that the prosecutor just flatly asserted that the victim was testifying credibly. That's not what happened. He said, I think that she was testifying credibly. I think she was credible. And there's a difference between I think and you, the jury, can infer this, or we can infer this. That's what the court held in People v. Boyle. And that is the reason why this was incorrect. This was also not an argument about the witness's demeanor. The state doesn't specifically mention demeanor. It's different than the cases the state cites, such as Emerson and Sims, where the prosecutor there did specifically talk about the witness's demeanor. Well, let's assume then that the comments perhaps were not properly worded. Where is ‑‑ I mean, it's improper to overturn the verdict unless there is substantial prejudice. Where is the substantial prejudice to the defendant here given the evidence that we've just been talking about? This prejudice comes from the fact that Fox's testimony is, again, the linchpin holding everything together. The jury needed to make its decision whether they believed her story was unencumbered by the prosecution's personal opinion on her credibility, on these intrinsic characteristics about her person. And without the jury being able to do that, with the jury focused on what the prosecutor thought, there's no way that we know they've made the real credibility determination they needed to make on their own. And that's the prejudice. And that's why a new trial is required in this case. Just a few points on the second issue then. There is ‑‑ the prosecution says that our only argument is this. It's about the closing argument. And really, that's all we need. There's no way the jury would know from the evidence presented, from the instructions, from the closing argument, there's no way the jury would know that they could not use the wire transaction to calculate the total amount of costs. Was there a motion for a directed verdict filed? I believe there was. And it was denied, wasn't it? Yes. Wouldn't that imply that the trial court made a determination, regardless of any commentary that was, I believe, subsequently made by the prosecutor, that the evidence was such with or without her testimony? And if it was with her testimony, it would infer, I think, that she was credible. How, then, could you establish substantial prejudice on the basis that the motion for a directed verdict was denied? In terms of the prosecutorial misconduct? Well, that is a different standard of review. That is taking the evidence in the light most favorable to the state. We have not raised a sufficiency of the evidence challenge here. Our argument is based on the closely balanced evidence prong, plain air review, as well as the fundamental rights prong. And the different, whether or not evidence is closely balanced, is a different question than the question the court answered in denying the directed verdict. Here, the evidence, as for the reasons we've stated. I assume defense counsel cross-examined the lady. Is that correct? Yes. Did he ever get her to concede that this was a gift to your client? No, no. But, again, based on the many holes in her testimony, there could be a reasonable doubt whether the purpose she testified the money was given for was the purpose it actually was given for. Well, let me couch it in a slightly different perspective. Could you explain to me how, if it wasn't a gift, why the defendant's own actions didn't establish that he was guilty of the charges that were brought against him, regardless of what she testified to? In other words, to me, the only way he gets off on a case like this, if I'm sitting as a bench trial judge, is if he establishes, by a reasonable doubt, that this was a gift, that they had some sort of intimate relationship or something of that nature. Or he was a protégé, and she was going to mold him like a muse into some financial empire builder or something. So unless you presented, or I should say your client presented, some basis to believe that there wasn't a quid pro quo, there wasn't consideration of any kind given, that this was just a gift, I don't know where you're going with this, really. Try and persuade me, please. Well, there's two points. The first point is, as I said before, it's the state's burden of proof. The defense obviously does not have to prove anything. Second, there's the matter of time. This was a short time, I believe approximately 45 days, between when the defendant gets the money and when everything starts to go haywire. So with no written documentation, with no agreements on what is going on, the question is, why did she give him this money? Perhaps it was a gift. Perhaps it was something else. But again, it's the state's burden to show that. And the only way we know why she did it is from her own testimony. And that's why her credibility is the key to this case. Unless there are... I have another question with respect to the wire fraud count. Sure. Is that a lesser included offense of the theft that was charged in count one? No, we're not relying on that. Okay. But that is one of the requirements if you want to show prejudice, is it not? For one act, one crime? Yes. According to the King case. The lesser included analysis is sort of secondary to was this one act or were the acts apportioned between the cases? And since the cases were not apportioned, this court doesn't even have to address the lesser included offense, whether or not it is. Well, in King, they indicate prejudice with regard to multiple acts exists only when the defendant is convicted of more than one offense. Some of which are, by definition, lesser included offenses. So I think that is a requirement in this instance as well. I disagree respectfully, Your Honor. I believe that once it has been established that the acts were not apportioned as they were not here due to the state's closing argument, then the lesser included analysis is moot. That's a separate alternative basis for vacating the convictions. You're saying it's not a lesser included because you're conceding that the wire fraud was not included in count one, in the indictment itself? Because it's based on the elements. It's not a lesser included. Obviously, in regards to the indictment, obviously the indictment uses the word checks, but that is not how the case was presented to the jury. I understand the argument. And the defendant would just then respectfully request that this court remains his case for a new trial or alternatively vacate his conviction in count six. Thank you. There will be a short recess. There's another case on the call.